## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

VICKI C. HOOD and )
WILLIAM KEITH RIDLEY )
  )
    Plaintiff, )
  ) No. 3:04-0473
v. ) Judge Nixon
  ) Magistrate Judge Griffin
TENNESSEE BOARD OF REGENTS; )
TENNESSEE SMALL BUSINESS )
DEVELOPMENT CENTER; )
DR. PAULA SHORT, individually and in )
her official capacity as Vice Chancellor; )
ALBERT LAABS, individually and in his )
official capacity as Executive Director; )
and DR. CHARLES W. MANNING, )
individually and in his official capacity as )
Chancellor )
  )
    Defendants. )

### MEMORANDUM ORDER

Before the Court is Defendants' Motion for Summary Judgment and supporting

documents (Doc. Nos. 30-33), to which Plaintiffs have responded (Doc. Nos. 42-48). For the

reasons stated herein, the Court **GRANT**S in part and **DENIES** in part Defendants' Motion for

Summary Judgment.

Plaintiffs Vicki C. Hood ("Hood") and William Keith Ridley ("Ridley") allege that Hood

was wrongly terminated and Ridley was effectively discharged from their positions at the

Tennessee Small Business Development Center ("TSBDC") in September 2003 after reporting

several complaints about the TSBDC to Governor Breseden's office. Defendants are the

-1-

Tennessee State Board of Regents, the TSBDC, Albert Laabs ("Laabs") (individually and in his official capacity as Executive Director of the TSBDC), Dr. Charles Manning ("Manning") (individually and in his official capacity as Chancellor of the Board of Regents), and Dr. Paula Short ("Short") (individually and in her official capacity as Vice Chancellor of the Board of Regents). The Court **GRANTS** summary judgment on Plaintiffs' claim of Retaliatory Discharge under Tennessee law against Plaintiff Ridley, of violations of Title VII, and of Defamation of Plaintiff Hood. The Court **DENIES** summary judgment on Plaintiffs' claims of violations of the First Amendment, of Retaliatory Discharge under Tennessee law against Plaintiff Hood, and of Aiding and Abetting.

## BACKGROUND

### F.     Plaintiff Hood's Employment History

Plaintiff Hood was hired by the TSBDC to be its Executive Secretary on May 1, 2000. Plaintiff Ridley was her supervisor in this position. Though Hood was placed on probation for 30 days in February 2002 for a conflict with another employee, the matter was later investigated and it was determined that Hood was not at fault. In January 2003, Hood was promoted to Administrative Assistant and Defendant Laabs wrote the following in his recommendation for her: "Vicki has done an excellent job while filling in for the vacant position . . . she is well received by the field staff." (Doc. No. 54.)   Her evaluation in 2003 reflected that she was an "exceptional" and "outstanding" employee.

### B.     Plaintiff Ridley's Employment History

Plaintiff Ridley was hired by the Tennessee Board of Regents in April 2000 as the

Assistant Director of the Board of Regents and Associate State Director of the TSBDC. The duties of this position included managing a small business consulting network with thirteen centers around the state. Ridley is African-American and, aside from a temporary clerk, there were no other African-American employees working at the TSBDC during his tenure there. He resigned from his position on September 22, 2003, claiming that he was effectively discharged.

Plaintiffs allege Laabs treated Ridley differently than other employees because of his race. For example, Laabs would aggressively confront him and would instigate mistrust between Ridley and the other employees. On March 28, 2001, Laabs informed Ridley that four staff members had filed complaints about his communication skills, but when Ridley asked each of these staff members about it, they denied filing these complaints. Nancy Straley ("Straley"), another staff member at TSBDC from 2000-2003, testified in her affidavit that "co-workers could tell by the body interaction and tone of voice that Albert Laabs treated Keith Ridley with disrespect." (Straley Aff. 2.) She stated that Laabs never supported Ridley in his management decisions, and that he repeatedly treated Ridley with "a great deal of disrespect." (Id.) She believed the mistreatment was racially based, stating that Laabs "would repetitively speak to black individuals as 'you people'. . . I felt that this had a racial bias because these remarks were being directed towards the black individuals." (Id.) She concluded that Laabs' disrespect towards Ridley "was to such a great extent that it was even affecting my ability to effectively work in the office and it was one of the reasons I left the office." (Id.) Hood also noted in her affidavit that Laabs made remarks about some of Ridley's personal decisions, such as commenting that the fact that Ridley needed to buy a new suit for his relative's funeral must be some sort of "cultural thing." (Hood Aff. at 5.)

Ridley complained to the management offices about this mistreatment on several occasions and nothing was done about it. After his first performance evaluation Ridley went to the Director of Human Resources and informed her that he believed Laabs had given him negative feedback because he was discriminating against him based on his race. In 2002 he refused to sign his own evaluation because he believed some of the findings about his work to be inaccurate.

Ridley also believes that Laabs failed to invite him to the semi-annual office trip to Washington, D.C., during which they were to meet with members of the legislature. Laabs instead invited Jamie Frakes ("Frakes"), a white male, despite the fact that Ridley held a higher position than Frakes. Ridley had been invited the previous year.

### C. Plaintiffs' Complaints to the Governor's Office

On August 25, 2003, Plaintiffs Hood and Ridley went to Governor Breseden's office and spoke to Margaret Horn ("Horn"), Director of Community Affairs, about several concerns they had with the TSDBC, detailed in the following sections. She informed them that their comments would be kept confidential. Plaintiffs allege that she told them she would type their complaints and allow them to confirm the document. However, she never contacted them again and instead reported their allegations to Manning, Chancellor of the Board of Regents. He sent a letter back to the Governor's office denying the allegations on September 19, 2003 and copied it to all TSBDC staff. This letter explained that the complaints had been filed by two employees in one of the offices of the TSBDC, and that the office in question only had six employees total. Plaintiffs believe that their identities were revealed by this letter because their office was the only one comprised of six employees, two of whom were new and therefore would not have filed

a complaint. On September 24, 2003 he sent another letter about the matter to Short, which was copied to the senior staff of the Tennessee Board of Regents and the Tennessee Technology Centers. This letter names Plaintiff Hood specifically.

Ridley resigned from his position on September 22, 2003. He alleges that he did so because his work environment had become hostile and that he was constructively discharged. In his affidavit he stated "I know that if I stayed at TSBDC my career would be ruined both by allegations that I was not properly doing my job and I feared I was really being set up to be terminated especially with Jamie Frakes being offered my position." ( Ridley Aff. at 36.)

On September 24, 2004, Short wrote to Hood asking for any additional evidence to support the allegations she had made at the Governor's office. Hood replied that she could not provide her with any further documentation or specific information. Hood was fired on September 30, 2003 for allegedly making unsubstantiated claims that disrupted the workplace. Her termination letter also states, "[it] is clear that you have been unable to maintain the behavior expected in the workplace," though it does not provide any examples of unprofessional behavior. Hood stated that she "was not a source of office turmoil," but was instead terminated "because I was a whistleblower and I think senior staff knew who had gone forward." (Hood Aff. at 3.) Plaintiffs discussed the following issues with Horn in their August 25, 2003 meeting:

1.    *Time-Keeping and Travel*

Plaintiffs informed Horn that Laabs, whose home was in Memphis, often scheduled work-related appointments in Memphis on Thursdays and Fridays so that he could charge the state the mileage for the drive home for the weekend. However, Plaintiffs also allege that he did

not actually attend these appointments in Memphis, but instead took those days off entirely. Nancy Straley, also stated in her affidavit that she learned that Laabs had not visited the Memphis office in two years, despite the fact that he had told her he was visiting the office many times during that period. (Straley Aff. at 3.)

As the Administrative Assistant one of Hood's duties was to maintain time-keeping records for the staff. Specifically she was responsible for signing the records to indicate that they had been reviewed for accuracy. On May 7, 2003, Hood refused to sign Laabs' time sheet because she believed that Laabs had lied on the form and that his trips to Memphis were in violation of company policy stating that the state was prohibited from reimbursing employees for normal commuting milage, and that "when traveling, state employees should be as conservative as circumstances permit." Further, Hood did not believe that Laabs was recording all of the leave that he was taking. Her refusal was brought to Short's attention, who insisted that Hood sign the report or her job would be reassigned. When she continued to refuse, Short signed the time-keeping record herself.

2. *Jungle Marketing Contract*

The Tennessee Board of Regents has a specific policy requiring that all purchases made by the TSBDC be competitively bid. Ridley was responsible for overseeing that goods and services provided under contracts with the TSBDC were acceptable and not wasteful. In December 2000, the TSBDC contracted with a marketing company called Jungle Marketing to design and develop a statewide marketing campaign for the TSBDC. Ridley was responsible for overseeing the deliverables and ensuring that they were of an acceptable quality. In May 2001, Laabs requested that Ridley draft a document outlining five reasons that justified sole sourcing

-6-

the contract to Jungle Marketing. Laabs then turned this email into a letter to the Chancellor to justify the sole sourcing.

Ridley complained several times throughout 2001 about the poor quality of the Jungle Marketing reports and products but the contract remained. In 2003 Ridley, learned from Frakes that Laabs was a personal friend of the owner of Jungle Marketing. Based on the fact that the contract had not been bid competitively and the owner was a friend of Laabs, Ridley concluded that there was a conflict of interest in awarding the contract to Jungle Marketing.

### 3.  *Hiring Procedures*

Plaintiffs told Horn that the hiring processes were unfair and inequitable. Specifically, they complained that Laabs hired a white male, Frakes, to fill the Associate State Director position, which Ridley already held. They did not believe that Laabs had followed the appropriate hiring procedures in hiring Frakes, and contended that Frakes had been offered a higher salary than Ridley, who held the same position.

### 4.  *Cynthia Fry Report*

Dr. Cynthia Fry ("Fry"), an Employee Assistance Counselor, was hired by the State in 2003 to investigate personnel problems at the TSBDC. She found that all but one employee found Laabs to be "biased against women and blacks." She also found that Laabs had implemented a "clear pattern of undermining moves" towards Ridley and that another employee had remarked that the environment was "so toxic that she had to leave." She concluded the following about Laabs: "[p]erceptions by all staff make it highly unlikely this individual can ever achieve respect or be effective. You might consider probation with guidelines including: 1) No games (precise wordage), 2) Empower Keith [Ridley] by not interfering with supervisory

-7-

relationships, 3) Honesty."

However, Fry's report was dismissed by Short as being "non-responsive." There was no follow-up on these allegations of racial bias in the office.

## STANDARD OF REVIEW

Summary judgment may be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, courts must view all the facts and the reasonable inferences to be drawn from those facts in the light most favorable to the non-movant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party bears the burden of proving the absence of a genuine issue of material fact as to an essential element of the non-movant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine issue of material fact is one which, if proven at trial, would lead a reasonable fact finder to find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

The non-movant may not rely solely on conclusory allegations in the complaint to defeat a motion for summary judgment, but must come forward with affirmative evidence that establishes its claims and raises an issue of genuine material fact. Celotex, 477 U.S. at 324. Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. See Anderson, 477 U.S. at 247-48. "The mere existence of a scintilla of evidence in support of the

-8-

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Shah v. Racetrac Petroleum Co., 338 F.3d 557, 566 (6th Cir. 2003).

The substantive law involved in the case will underscore which facts are material, and only disputes over outcome-determinative facts will bar a grant of summary judgment. Anderson, 477 U.S. at 248. Drawing all justifiable inferences in favor of the non-moving party, the Court must determine whether a reasonable fact finder would be able to return a verdict for the non-moving party and if so, the Court must deny summary judgment. Id. at 249-50. However, if the non-moving party has not "produced enough evidence for a jury to be able to return a verdict for that party," summary judgment should be granted. Tinsley v. Gen. Motors Corp., 227 F.3d 700, 703 (6th Cir. 2000).


**DISCUSSION**

      A.    *Claims*

            1.     **First Amendment**

Plaintiffs allege that Defendants retaliated against them for speaking out on a matter of public concern in violation of their First Amendment rights. The Sixth Circuit reiterated the Supreme Court's holding in Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274 (1977) when it held that the test to be applied to allegations of retaliation for a plaintiff's exercise of his or her First Amendment Rights is as follows: "1) the plaintiff engaged in constitutionally protected speech, 2) the plaintiff was subjected to adverse action or was deprived of some benefit, and 3) the protected speech was a 'substantial' or a 'motivating factor'

-9-

in the adverse action." Brandenburg v. Hous. Auth. of Irvine, 253 F.3d 891, 897 (6th Cr. 2001) (citing Mt. Healthy, 429 U.S. at 287). The burden then shifts to the employer to show that the adverse employment action would have been taken regardless of the employee's participation in the protected activity. Mt. Healthy, 429 U.S. at 285.

*a.* *Constitutionally Protected Activity*

In order to be considered speech that is protected by the First Amendment, Plaintiffs must have spoken about a matter of public concern. In Connick v. Myers, 461 U.S. 138 (1983) the United States Supreme Court held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-148. Further, courts have held that "when government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees . . . their speech is inherently a matter of public concern." Ceballos v. Garcetti, 361 F.3d 1168, 1174 (9th Cir. 2004) (citing Blair v. City of Pomona, 223 F.3d 1074, 1079 (9th Cir. 2000) and Johnson v. Multnomah County, Or., 48 F.3d 420, 425 (9th Cir. 1995). While this Court is not bound by the decisions of the Ninth Circuit, its holdings are useful in the consideration of this case.

However, courts have also held that the employee "must be speaking as a citizen, not as an employee for personal interest purposes." Rodgers v. Banks, 344 F.3d 587, 596 (6th Cir. 2003), (citing Connick, 461 U.S. at 146-47). Similarly, a discussion of public money and government efficiency do not alone make the speech protected. Barnes v. McDowell, 848 F. 2d 725, 734 (6th Cir. 1988). Even if only a portion of the complaints are of public concern and others are personal, it can still constitute protected speech. Banks v. Wolfe County Bd. of Educ.,

-10-

330 F.3d 888, 895 (6th Cir. 2003).

Plaintiffs allegedly made four specific complaints to Horn which they argue should fall under protected speech. The first was regarding Laabs' alleged time-keeping and travel abuse. Plaintiffs allege that Laabs regularly scheduled meetings near his home in Memphis on Thursdays and Fridays so that he could be reimbursed for the travel, and yet had not been to the Memphis office in two years.[1]  Laabs alleged behavior is indeed in violation of the General Travel Policy  which states that "[w]hen traveling, state employees should be as conservative as circumstances permit.  The lower cost should be selected whenever practical.".

In Marohnic v. Walker, 800 F.2d 613 (6th Cir. 1986), the Sixth Circuit held that the plaintiff, who was previously employed by a regional mental health board, had made protected speech when he alerted an investigator from the State Attorney General's office that the board was engaged in fraudulent billing.  In that case the court held that "public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law," id. at 616 (citing Connick, 461 U.S. at 149), and when "seeing that public funds are not purloined."  Id. (citing Czurlanis v. Albanese, 721 F.2d 98, 104-105 (3d Cir. 1983);  Pickering v. Bd. of Educ. of Twp. High School Dist. 205, Will County, 391 U.S. 563, 569-70 (1968)).

In the present case there is an issue of material fact as to whether Plaintiffs were indeed

---

[1]This statement was provided by another employee, Nancy Straley, who said in her affidavit that she had spoken to the Memphis office and they had confirmed that Laabs had not been in the office in two years.  Defendants argue that this evidence should not be admitted because it is hearsay.  However, because this could have been a statement made against the interest of the Memphis office and therefore may be reliable testimony, this Court will consider this evidence at the summary judgment stage.  Straley also testified that Laabs would not take Straley to Memphis to perform her job duties there, and as a result she believed he was not really working while he was away.

-11-

alerting Horn to a matter of corruption and possible waste of public funds. Consequently, statements about Laabs' travel abuse could be considered protected speech.

Second, Plaintiffs also claim they told Horn that they believed Laabs had sole sourced a marketing contract to Jungle Marketing, which was owned by a friend of Laabs, instead of allowing for a competitive bidding process for the contract as required by the Board of Regents. Although there is a significant dispute as to the facts of this allegation, this Court must view the facts presented in the light most favorable to Plaintiffs. If the product was indeed sole sourced to a friend of Laabs instead of being competitively bid, this meets the standard of corruption, misconduct or inefficiency by the government and should be entitled to First Amendment protection. It is further relevant to the public because both Plaintiffs allege that the Jungle Marketing product was of such low quality and value in comparison to how much Jungle Marketing charged for it.

Third, Plaintiffs contend that they spoke to Horn about the unfair and inequitable hiring processes. Specifically they told Horn about Laabs hiring a white male for the Associate State Director position, which was already held by Ridley. Relatedly, they also spoke to Horn about the report produced by Fry, in which Plaintiffs and other staff complained of Laabs' racial bias. This report was never distributed to staff, nor were the complaints of racial discrimination investigated by the management. The report provides that Laabs is dishonest and that all but one employee identified him as being biased against women and African Americans,[2] which was

_____

[2]Defendants argue that the Fry report should not be considered by this Court because it is hearsay. However, Federal Evidence Rule 803(8) permits the admission of investigative reports, if they can be determined to be trustworthy. Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 167 n. 11. Without further proof about the report or Fry this Court is unable to evaluate the report's trustworthiness at this time and therefore considers it in the light most favorable to the Plaintiffs.

-12-

echoed by Ridley, Hood and Straley in their testimonies. Courts have consistently held that employee statements alleging racial discrimination within a public agency are inherently matters of public concern. See Connick, 461 U.S. at 159 and Perry v. McGinnis, 209 F.3d 597 (6th Cir. 2000). Therefore, if Plaintiffs' version of the facts is accurate, their allegations of racial bias reach the level of public concern.

                b.     *Causal Connection Between Speech and Adverse Employment Action*

If Plaintiffs are able to establish that their speech constitutes a matter of public concern, the next step is to show that this speech was a substantial motivating factor in the adverse employment action. Defendants argue that Hood and Ridley's talk with Horn was not the motivating factor in the adverse employment action for two reasons. First, Defendants suggest that Horn did not reveal who specifically had filed the complaints, and therefore Laabs and Manning were unaware of Hood and Ridley's identities. While this may be true, Plaintiffs make a strong argument that Defendants could easily deduce who filed the complaint, and that they most likely did so. Indeed, Horn stated that the complaint came from a staff of six, and Plaintiffs' office was the only TSBDC office that matched that description. Short confirmed in her deposition that she believed the allegations referred to this office. Furthermore, clearly Laabs would not have filed the complaint, and two of the other staff members were recently hired and most likely would not have filed such a complaint so early in their employment. That left only three employees, including Plaintiffs Ridley and Hood, who could have filed the complaint. And, since both Ridley and Hood had made similar complaints in the past, it would be reasonable to conclude that Defendants were aware that it was Hood and Ridley who filed this complaint as well. Short even stated in her deposition that she knew that Hood and Ridley were

the two people who had filed complaints about the Jungle Marketing contract and Fry's report in the past. Thus, Plaintiffs have established enough circumstantial evidence that Defendants were aware of their identities to create a question of material fact.

Second, Defendants argue that even if the individuals involved were aware that Ridley and Hood had filed the complaints, this did not cause an adverse employment action. In Hood's case Defendants state she was terminated not because she spoke to the Governor's office, but because of her previous disciplinary issues, the fact that she subsequently discussed the complaint she had filed with an employee at another TSBDC location site, and because of the "caustic" manner in which she replied to the Chancellor's letter to the staff about the complaints.

However, Plaintiffs highlight the fact that Short specifically stated that Hood was not terminated because of her conversation with the other employee or for the letter to the Vice Chancellor. Additionally her prior work record was almost flawless, with the exception of one probationary period because of a dispute with another co-worker, which was later determined to be the result of the other party's conduct. Based on the record it is likely that Hood was terminated for complaining to the Governor's office.

Ridley was not terminated but instead resigned, and alleges that he was constructively discharged. Defendants argue that Ridley in fact was planning to resign prior to speaking to Horn, in order to take a better job. However, the record reflects that Ridley did not decide to resign until the day that the Chancellor's letter was released. Additionally, a September 19, 2003 email from Ashley Duncan in the Governor's office to Horn states that Ridley called the Governor's office in hysterics after Manning's letter was released because he was afraid for his

-14-

job.  Based on these facts the Court finds that it is unlikely that Ridley resigned for any reason other than that he grew tired of the mistreatment he was receiving, and because he was afraid he would be fired for speaking with the Governor's office and of the repercussions of such a discharge on his future employment.

In sum, because Plaintiffs have produced enough evidence to establish a *prima facie* case of a First Amendment violation, summary judgment is **DENIED** on this claim.

### 2.    Retaliatory Discharge Under Tennessee State Law

Defendants argue that Plaintiffs failed to meet their burden under title 50, section 1-304 of the Tennessee Code, which addresses whistleblower activity.  According to the Tennessee Court of Appeals, this Act "clearly indicates that the legislature intended to provide employees with a statutory remedy when discharged by an employer solely for refusing to participate in, continue to participate in, or to remain silent about illegal activities."  Merryman v. Central Parking Sys., Inc., 1992 WL 330404, at *6 (Tenn. Ct. App. Nov. 13, 1992).  The burden is on the Plaintiff to make a *prima facie* case of retaliatory discharge, as required by title 50, section 1-304(a) of the Tennessee Code.

The requirements for making a *prima facie* case are twofold.  First the Plaintiffs must show that the activity they reported constituted a violation of the "criminal or civil code of this State or the United States or any regulation intended to protect the public health, safety and welfare."  Tenn. Code Ann. 50-1-304(b).  Second, the Plaintiffs must establish an exclusive causal relationship between the whistleblower activity and the employer's termination of the employees.  Id.  Therefore, unlike the First Amendment cause of action, under Tennessee statutory law Plaintiffs must show that his or her speech regarding the illegal activity was the

-15-

sole reason for his or her dismissal. <u>Guy v. Mutual of Omaha</u>, 79 S.W. 3d 528, 535 (Tenn. 2002).

Defendants first argue that Plaintiffs fail to meet their burden under this statute because Hood and Ridley did not report violation of a law or regulation "intended to protect public health, safety and welfare." Tenn Code Ann 50-1-304(b). Specifically, Defendants argue that managerial negligence does not constitute an illegal activity. <u>See</u> <u>Robbins v. Flagship Airlines, Inc.</u>, 956 S.W. 2d 4, 7 (Tenn. Ct. App. 1997). However, as the Court outlined above, Plaintiffs were indeed complaining to Horn about violations of the law.

Nonetheless, Defendants highlight that Plaintiffs must then meet the high burden of showing that their termination was "solely" a result of their whistleblower activities. <u>Merryman</u> at *6. This requires "[a]n exclusive causal relationship between the plaintiff's refusal to participate in or to remain silent about illegal activities and the employer's termination of the employee." <u>Id.</u> Further, "[a] mere inference that the Plaintiff was terminated because [she reported illegal activities], which arises solely from the fact of dismissal, is not enough to make out a cause of action under [the Act]." Instead the employee must present "specific admissible facts which realistically challenge the employer's reason for the termination of the employee." <u>Hubrig v. Lockheed Martin Energy Sys., Ins.</u>, 1998 WL 240128, at *8 (Tenn. Ct. App. May 4, 1998).

Viewing the facts in the light most favorable to the Plaintiffs, based on the timing of her termination and her generally positive employment record, this Court is able to reach the conclusion that Plaintiff Hood may have been terminated solely because of her whistleblower activities. Further, Short dispels the possibility that she was terminated because she spoke to Pat

-16-

Geho, or because she wrote Manning a disrespectful letter. As nothing in Hood's employment record demonstrates an alternative reason for her termination, Defendant's claim for summary judgment on Plaintiff Hood's retaliatory discharge claim is **DENIED**.

In order to reach the conclusion that Ridley's rights under this Act were violated, this Court must conclude that Ridley felt compelled to resign because the working conditions had become intolerable solely as a result of his whistleblower activities. Based on the facts presented by Plaintiffs, Ridley resigned because he was afraid he would be terminated based on the whistleblower activity and his prior interactions with Laabs. As a result it does not appear Plaintiff Ridley has a valid claim under this statute, which requires the whistleblower activity to be the sole reason for the adverse employment action. Consequently the Court **GRANTS** summary judgment on Ridley's retaliatory discharge claim.

### 3. Title VII of the Civil Rights Act of 1964

Title VII of the 1964 Civil Rights Act prohibits racial discrimination "that creates a hostile or abusive work environment." Newman v. Federal Exp. Corp., 266 F.3d 401, 405 (6th Cir. 2001) (citing Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999)). In order to establish a *prima facie* case of a hostile work environment based on race under Title VII, Plaintiff must show:

> 1) that he is a member of a protected class; 2) that he was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability.

Id. In determining whether the workplace was hostile, a court should consider the totality of the circumstances. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The court may

consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

Viewing the totality of the facts in this case in the light most favorable to the Plaintiffs, this Court is unconvinced that Laabs' treatment towards Ridley reached the level of hostility required by Title VII. Although the evidence shows that Laabs was often rude and disrespectful to Ridley, the severity of the conduct does not reach the level articulated by the Sixth Circuit or Supreme Court. While Ridley states that he was often interrupted or yelled at by Laabs, and that on a few occasions Laabs undermined his leadership abilities or failed to take him on a business trip, this conduct does not appear to reach the level of hostility that Title VII was intended to prevent. See Harris, 510 U.S. at 21, (describing a hostile work environment as "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.")

Further, Plaintiffs have not presented sufficient evidence to show that Laabs' treatment towards Ridley was racially motivated. The only pieces of evidence that Plaintiffs present for his racial bias are the Fry report, in which other co-workers claimed that Laabs was biased towards women and African-Americans, and the fact that Laabs did not take Ridley to Washington on a work related business trip and instead took a white colleague, though he had taken Ridley in the past. These pieces of evidence are too generalized to support a conclusion that Laabs' treatment towards Ridley reached the level of a Title VII violation. Thus summary judgment is **GRANTED** on this issue.

-18-

### 4.     Aiding and Abetting Discriminatory Conduct, Tennessee

Plaintiffs allege that Defendants Short and Manning are liable for aiding and abetting under the Tennessee Human Rights Act ("THRA"), title 4, section 21-301 of the Tennessee Code. The Act states that a person or persons may not "(1)[ r]etaliate or discriminate in any manner against a person because such a person has opposed a practice declared discriminatory by this chapter or because such a person has . . . filed a complaint [about this practice]." Further the Act continues that a person may not "(2) [a]id, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter." The Tennessee Supreme Court has held that an individual who aids or abets in employment-related discrimination has violated the THRA and may be held individually liable. Carr v. United Parcel Serv., 955 S.W. 2d 832, 836 (Tenn. 1997). In Carr the court held that it would follow the common law civil liability theory of aiding and abetting and require that "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." Id. (citing Cecil v. Hardin, 575 S.W.2d 269, 272 (Tenn. 1978); Restatement (Second) of Torts § 876(b) (1965)). Additionally, liability for aiding and abetting would require "affirmative conduct." Id. Yet a supervisor will only be held individually liable "for encouraging or preventing the employer from taking corrective action" Id. at 838.

The evidence that Plaintiffs present to show that Short and Manning should be held liable for aiding and abetting include the fact that Short received the report by Fry citing examples and statements of bias against women and African-Americans and took no action in response. She did not question anyone about the alleged racial bias and did not tell Manning about the results

-19-

of the report.  Plaintiffs also allege that Short  was extremely rude to Ridley when he attempted

to speak to her about the issue, and that she continued to give Laabs positive leadership

evaluations after the report was written.  Manning similarly made the Fry report confidential and

failed to follow up on the information and other complaints.

The Court finds that based on these facts it appears that Short and Manning may indeed

have prevented corrective action in this case, and as such did provide substantial assistance to

Laabs in perpetuating his alleged discriminatory behavior.  Summary judgement is therefore

**DENIED** on Plaintiffs' claims of aiding and abetting under the THRA.

### 5.      Defendant Manning's Liability for Defamation

Plaintiffs argue that Defendant Manning defamed Plaintiff Hood by writing a letter to the

Regents regarding her problems with TSBDC.  In order to establish a *prima facie* case of

defamation a plaintiff must show that "1) a  party published a statement; 2) with knowledge that

the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the

statement or with negligence in failing to ascertain the truth of the statement."  Sullivan v.

Baptist Memorial Hosp., 995 S.W.2d 569, 571 (Tenn. 1999).  Under this framework the first

question is whether the statement in question was in fact published.  Defendants argue that it was

not published because it was a statement made between business associates regarding normal

employment behavior.  Freeman v. Dayton Scale Co., 19 S.W.2d 255 (Tenn. 1929).

Alternatively, Plaintiffs suggest that this letter should fall under the "need to know exception"

noted by the Tennessee Court of Appeals in Woods v. Helmi, 785 S.W.2d 219 (Tenn. 1988),

which entails that the privilege between employees only extends when the communication is

extended to those who "need to know" the information or in other words, information that is

-20-

"flowing through the proper chain of command." Id. at 222.

In the present case, the Chancellor sent the letter in question to the Board of Regents, the TTC Directors and the senior staff. Plaintiff Hood alleges that since the TSBDC is a different entity from the Centers, there was no need for the letter to be circulated to all of these organizations. Ultimately Plaintiff contents that they are not protected by the "need to know" privilege. Yet Defendants argue that Manning sent the letter to such a large group because he wanted to alert them to the fact that the Channel Four News would be doing a story on the incident.

Plaintiffs contend that this case is similar to Wright v. Seay, 1997 WL 576538 (Tenn Ct. App. Sept. 19 1997) in which a prisoner sued managers of different sections of the prison for defamation because the managers spread false accusations against him throughout the prison. But the present case can be differentiated from Wright because here the different offices could in fact benefit from this information in regards to its work. The information in Manning's letter constitutes the type of communication that the workplace privilege was intended to protect, and therefore it does not fall under the "need to know" exception. As there was not publication, Plaintiff Hood fails to establish a prima facie case of defamation and summary judgment is **GRANTED**.

      **B.** *Defenses*

          **1.**    **Sovereign Immunity**

Defendants argue that Plaintiffs' claims under 42 U.S.C. § 1983 for money damages are barred by sovereign immunity based on the Eleventh Amendment to the Constitution of the United States, which prevents individuals from suing states in federal court unless the state

consents to be sued or Congress overrides such immunity. <u>See</u> <u>Hans v. Louisiana</u>, 134 U.S. 1, 15-18 (1890). But in order to determine whether Eleventh Amendment immunity should apply to this case, it must be clear that the TSBDC is an arm of the state. <u>Mt. Healthy</u>, 429 U.S. at 280.

The Sixth Circuit has held that the entity asserting Eleventh Amendment immunity has the burden of showing that it is entitled to this immunity because it is an arm of the state. <u>Gragg v. Kentucky Cabinet for Workforce Dev</u>, 289 F.3d 958, 963 (6th Cir. 2002). In <u>Gragg,</u> sovereign immunity was denied to an entity because it failed to show "what degree of control the state maintains over the entity, where the funds for the entity are derived, and who is responsible for the judgment against the entity." <u>Id.</u> (citing <u>Brotherton v. Cleveland</u>, 173 F.3d 552, 560 (6th Cir. 1999).

Defendants attempt to show that the TSDBC is an arm of the state because it was established in Tennessee pursuant to title 49, section 8-63 of the Tennessee Code, which states that the TSBDC "shall operate as a unit of the University of Memphis." The University of Memphis is part of the state university system as per title 49, section 8-101(a) of the Tennessee Code. Defendants allege that the contract, governance, management and control of the TSBDC is vested in the Tennessee Board of Regents. However, Defendants fail to provide any statute, policy statement or other evidence to prove this assertion. Additionally, Defendants provide no information regarding on the funding of the TSBDC specifically, nor any case law in which the TSBDC, or any other Small Business Development Center nationally, has been considered to be an arm of the state and thereby qualified for Eleventh Amendment Immunity.

Plaintiffs alternatively argue that the TSBDC is not an arm of the state because of its funding from and relationship with the federal government. The TSBDC is part of a national

-22-

network of Small Business Development Centers.  These centers exist as the result of a cooperative agreement with the United States Small Business Administration, which was established through 13 C.F.R. Part 130.  The Federal Small Business Administration is required by law to monitor and oversee the cooperative agreement and the ongoing operations of the Small Business Development Center network, as well as to ensure the efficient use of federal funding provided to the network.  13 C.F.R. Part 130.800.  13 C.F.R. 130.110 provides that non-federal funds must comprise at least 50% of each TSBDC's funding, but does not specify as to where each individual Center should obtain this funding.  Further, 13 C.F.R. Part 130.200 provides that each Center must be based on a university or college, but not necessarily a public university of college.  Therefore it is unclear from these federal laws whether the TSBDC offices were intended to be part of each individual state's system.

Defendants request that this Court find that if a state's treasury is at risk or if responding to a suit would undermine "the respect owed [States] as members of the federation," Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 40 (1994), then the state must be accorded sovereign immunity.  However, in this case Defendant has not produced enough evidence to show that the TSBDC does indeed meet these criteria and therefore Eleventh Amendment immunity is not an available defense at the summary judgment stage.   Moreover, the Court does not reach the question of whether the TSBDC has waived its immunity at this time because immunity has not been established.

### 2.    Defendants' Immunity in their Official Capacities

Defendants also argue that Defendants Manning, Laabs and Short are not "persons" in their official capacities and should not be subject to suit pursuant to 42 U.S.C. § 1983 because

the TSBDC is immune to suit based on Eleventh Amendment immunity. However, for the reasons stated in the above section, this Court will not grant the TSBDC Eleventh Amendment immunity at this time, and therefore, the above named Defendants will also not be found immune at the summary judgment stage.

### 3.    Retaliatory Discharge and Eleventh Amendment Immunity

Similarly, Defendants argue that Plaintiff's claim of retaliatory discharge is barred by the State's Eleventh Amendment immunity. Specifically Defendants state that the Tennessee "Whistleblower" Act (Tenn. Code Ann. 50-1-304) does not waive the State's immunity from lawsuits by former employees in federal court, and instead the State must clearly articulate that it is submitting itself to federal court jurisdiction. See Great N. Life Ins. Co. v. Read, 322 U.S. 47, 54 (1944). Yet the Whistleblower Act includes no such language.

However, as outlined above, Defendants have not provided this Court with suitable evidence to prove that the TSBDC is an arm of the state and thereby has not shown that Eleventh Amendment immunity applies in this case. As such, Eleventh Amendment immunity is not a sufficient defense at this stage.

### 4.    Common Law Retaliatory Discharge and Sovereign Immunity

Defendants argue that Plaintiffs' claim under common law retaliatory discharge should be dismissed because the TSBDC is an arm of the state and under the doctrine of sovereign immunity suits may only be brought "against the State in such manner and in such courts as the Legislature may by law direct." Tenn. Const. Article 1, Section 17. Yet again, Defendants have not provided enough evidence for this Court to determine whether the TSBDC is in fact an arm of the state, or whether its individual staff members are employees of the state. Without proof of

this assertion this Court cannot grant sovereign immunity to these parties.

5. **Qualified Immunity**

Defendants argue that Manning, Laabs and Short should also be immune from liability based on the doctrine of qualified immunity. The doctrine of qualified immunity establishes that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Supreme Court later clarified that in order for a right to be "clearly established" for the purpose of qualified immunity "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right . . . in light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

As outlined above, Plaintiffs have established a *prima facie* case for a First Amendment violation. First Amendment law in this regard is clearly established. See Connick, 461 U.S. at 159. As a result, summary judgment cannot be granted based on Defendants' defense of qualified immunity.

6. **Plaintiff Hood's Mitigation of Damages**

Defendants allege as a final defense that Plaintiff Hood failed to mitigate her damages following her termination. Plaintiffs counter that Defendants have no right to plead this point at summary judgment because Defendants failed to plead it in the response to the complaint and failure to mitigate damages is an affirmative defense which is waived if not mentioned at the complaint stage. Plaintiffs do not provide the Court with any supporting case law or statute

-25-

illustrating that Tennessee considers the failure to mitigate damages to be an affirmative defenses as many other states explicitly do, and this Court can find no such case. As a result, if failure to mitigate damages is not an affirmative defense in this jurisdiction then Defendants were not required to plead it in the first answer and may plead it now for the first time.

Defendants still retain the burden of showing this Court that Plaintiff failed to mitigate damages. To do so Defendants must establish that there were substantially equivalent positions which were available to Hood and that the Hood failed to use reasonable care and diligence in seeking such positions. Rasimas v. Michigan Dept. of Mental Health, 714 F.2d 614, 624 (6th Cir. 1983).

Defendants specifically argue that Hood failed to mitigate her damages because she accepted a receptionist job at a law firm with a comparable salary after her termination and then quit this job soon after. But Defendants make no attempt to demonstrate that Hood's TSBDC and law firm positions were substantially equivalent, other than in salary. Plaintiff Hood alleges that her receptionist position included far fewer duties and was not equivalent. "In the area of employment contracts comparability of status has been deemed more important in some situations than comparability of salary, for example in the context of mitigation." Rasimas, 714 F.2d at 624 (citing Williams v. Albermarle City Bd. of Education, 508 F.2d 1242 (4th Cir. 1974)). Because Defendants make no attempt to demonstrate that Plaintiff Hood's other employment opportunity was equivalent in any other manner than salary, and Plaintiff Hood claims that it was not substantially equivalent, the Defendants have failed to meet this burden and this is not an adequate defense at this time.

**CONCLUSION**

For the reasons stated herein, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment. The Court **GRANTS** summary judgment on Plaintiffs' claim of Retaliatory Discharge under Tennessee law against Plaintiff Ridley, of violations of Title VII, and of Defamation of Plaintiff Hood. The Court **DENIES** summary judgment on Plaintiffs' claims of violations of the First Amendment, of Retaliatory Discharge under Tennessee law against Plaintiff Hood, and of Aiding and Abetting.

It is so ORDERED.

Entered this the____14th____day of_____September_____, 2006.


JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT